IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MIA MONTEGA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) NO. 3:04-0227 |
| | ) JUDGE HAYNES |
| SMYRNA POLICE DEPARTMENT, | ) |
| et al., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM

Plaintiff, Mia Montega, filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. against the Defendants: Smyrna Police Department, the Town of Smyrna, (the "Town"), her former employer, and Jeff Jones, a Smyrna police officer and Plaintiff's former supervisor. Plaintiff asserts claims of a sexually hostile work environment and constructive discharge. Plaintiff also asserts claims under the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 et seq. as well as common law claims of intentional interference with employment, intentional infliction of emotional distress and slander.

Before the Court are the Defendants' motions for summary judgment (Docket Entry Nos. 14 and 23), both contending that Plaintiff's proof could not support a judgment for gender discrimination, sexual harassment or constructive discharge. In his motion for summary judgment (Docket Entry No. 23), Jones also argues that Plaintiff's proof is insufficient to support a judgment on Plaintiff's THRA claim against him.

In her response, Plaintiff admits almost all of the Defendant's Statement of Undisputed Facts (Docket Entry Nos. 30 and 31), but submits additional proof in her harassment claims. For purposes of the motion for summary judgment, Jones admits most of Plaintiff's Statement of Undisputed

Facts. (Docket Entry No. 41).

## A. FINDINGS OF FACT[1]

Plaintiff, Mia Montega[2] was employed by the Town as a patrol officer with its Police Department from July 1996 through September 2003. (Docket Entry No. 31, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 1). Defendant Jeff Jones was the Lieutenant for the shift to which she was assigned during most of her employment. Id. at ¶ 2. During her employment, Montega received pay raises almost annually and was promoted from patrol officer to field training officer.

In 1997, Montega sought a position as a bicycle patrol officer. Montega was told by Bobby Gibson, who was on bicycle patrol in the summer, that a former Commissioner, Sally Walls, told him Montega should not go on patrol with him because she would look like "Barbie". (Docket Entry No. 26, Attachment thereto, Montega Deposition at 210). This reference "to Barbie" is not the exact wording of Gibson's statement. Id. Based upon this remark, Montega believes that she was denied the bicycle patrol position because of her feminine appearance.

Jones was also the Commander of the STORM team, the Town's tactical unit. (Docket Entry No. 31 at ¶ 3). In 2000 or 2001, Jones asked the Montega to join the STORM team as an Emergency

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Given the parties' responses and the applicable law, the Court does not find any material factual disputes. Thus, this section constitutes findings of fact under Fed. R. Civ. P.56(d).

[2] Montega legally changed her name from Amy Butler during her employment with the city. (Docket Entry No. 26, Attachment thereto, Montega Deposition at 9).

2

Medical Technician ("EMT") given Montega's prior EMT school training. Id. at ¶ 4. Montega agreed and the police department paid for her to attend EMT school again. Id. After her EMT certification, Montega trained with the STORM team as one of the team's EMTs. Id. at ¶ 5.

In March 2000, Montega changed from second to third shift to attend an EMT training school that would improve her skills as a medic. Before she changed shifts, Jones promised Montega that once the training was completed, she would return to second shift. When Montega completed the training, she asked Jones to return to second shift, but he refused. After Montega's efforts, including complaints to Captain Jeff Dwyer, who was in charge of scheduling and "had the final say-so", Montega returned to second shift. (See Docket Entry No. 26, Attachment thereto, Plaintiff's Deposition at 207-08).

In September 2000, Montega requested and received vacation time for October, from the supervisor in charge of scheduling, Sergeant Bart Myers. Id. at 95. After Montega purchased airline tickets for a trip with her husband, Myers informed her that Jones had denied her vacation request and could not give her a reason why. Id. Montega inquired of Jones as to why her leave had been denied, and shortly thereafter Jones approved her leave. Id. 96-97. The vacation trip occurred as scheduled. Id. at 97.

In January 2001, Montega cites Jones's initial denial of a free tactical medical training program noting that the two male officers, Steve Martin and Allen Neighbors, were chosen to attend another school, but those officers had less seniority than Montega. (Docket Entry No. 27, Montega Deposition, 50, 51, 52 and 183). After her complaint, Montega received approval to go to that school. Id. at 51.

In February 2001, Montega was told by her shift supervisor, Sergeant Myers that he had to

3

be "harder on her because she was 'a girl'". Id. 215. According to Montega, Myers expressed his concern that if he were nice to her, there would be rumors of a romantic relationship between the two of them. Id.

In May 2001, when Montega's official department photograph was taken, the photographer told Montega to pull her hair down over one shoulder because he thought it would look good in the photograph. According to Montega, Dwyer verbally counseled her after Captain Laura Williams complained that Montega did not look professional in her picture because her hair was down. Dwyer told Montega that her picture looked "too girly" and requested that her picture be retaken. Roberta Putnam, a department employee also told Montega that "they" wanted Montega to have her picture redone because she looked like a girl. Montega, however, did not have her picture retaken. Id. at 49; see also Docket Entry No. 20, Dwyer Affidavit at ¶ 3.

In August 2001, Montega answered a domestic disturbance call involving an intoxicated man in a vehicle. After the intoxicated man was arrested, Montega attempted to move the vehicle out of the road. Shortly thereafter, Jones appeared and yelled at her not to move the vehicle. The intoxicated man laughed and taunted Montega. Montega was unaware that departmental policy prohibited officers from moving private vehicles, but she cites male officers, including Jones, who had done so. (Docket Entry No. 26, Attachment thereto, Montega Deposition at 189-90).

Also in August 2001, Jones told Montega that upon Dwyer's order, she was being moved to first shift because she was a Spanish-speaking female. When Montega asked Dwyer about her move given that there was a Spanish-speaking male with less seniority, Dwyer responded that Jones requested that Montega be moved. Montega then asked Jones about this move and was told that Jones replied that he wanted his "guys" on second shift. In any event, Montega remained on second

4

Case 3:04-cv-00227 Document 48 Filed 08/16/05 Page 4 of 14 PageID #: 36

shift. Id. 188-89.

In August 2002, Montega moved to first shift to attend law school at night. After attending law school for approximately one year, Sergeant Mike Brashear instructed Montega to write more tickets or face a change in her shift that would interfere with Montega's law school. Brashear also told Montega that all kinds of things could happen, that Montega interpreted as interference with her work or education. Id. at 197. Sometime in 2002, Detective John Liehr told Montega that she would have trouble being promoted because she looked very feminine. Id. at 194.

In the May 2003, Jones stated that Montega would not be allowed to attend any other training schools unless she attended the Moore County SWAT school. Lowery advised Montega that she should not attend this school because Jones had friends there that might retaliate against her. Id. at 89 and Exhibit A thereto.

Jones posted a memorandum for STORM team members on the bulletin board about a "training issue" between Jones and Montega that reads as follows: "It is unadvisable to set up your own training dates with higher authority without checking with me first. This will result in immediate dismissal from the team. Amy did this and will not be allowed to participate with the team until she completes the Moore County basic SWAT school." (Docket Entry No. 20, Dwyer Affidavit at Exhibit A). On or about May 4, 2003, Montega filed a formal complaint with the Town, asserting gender discrimination because Jones had never posted such memoranda detailing male officers' training. Id. at ¶ 8.

Helen Aldrich, the Town's Human Resources Manager, investigated Montega's complaint other incidents, by gathering and reviewing pertinent documents and interviewing Montega, Jones, current male and female police officers, and a former female officer. (Docket Entry No. 21, Aldrich

Affidavit at ¶ 3). After her investigation, Aldrich submitted her report to Chief of Police Mike Beach. Id. at ¶ 4. In her report, Aldrich concluded that she "could not find a pattern of discrimination or unequal treatment from Jones toward females." Id. Aldrich concluded that there was not any evidence that Montega had been singled out for being female. Yet, Aldrich noted that there was a fear of retaliation amongst officers for speaking out against their superiors, in particular, Jones. Id. Montega notes Aldrich's statement that Jones may have abused his authority and that Montega had to help Jones be a better supervisor. Id. Aldrich further cited Jones's conduct as "a misuse of authority" and recommended corrective action. Id.

Later, Captain Keith Lowery, Jones's direct supervisor, reviewed the Montega's complaint and Aldrich's report. (Docket Entry No. 30, Plaintiff's Response to Defendant's Statement of Undisputed Facts at ¶ 15). Lowery recommended that Jones should be suspended for two days without pay for violating Department policy. Id. Jones waived his right to respond to the charges and accepted Lowery's recommendation of discipline. On August 23, 2004, Jones resigned from the SWAT team. Id. at ¶ 22.

Montega states that Aldrich did not investigate fully some of the incidents involving her, including Montega's fear of retaliation for filing the complaint. In Montega's view, Aldrich focused on issues that did not pertain directly to Montega's situation, such as the "SWAT panties." According to Aldrich's report, the SWAT Panties was a legend about a joke in which officers would place "large novelty female underwear" on an officer's head to reflect that the officer "messed up in training". (Docket Entry No. 21, Aldrich Affidavit, Exhibit B thereto) Montega had not seen them. The term "SWAT Bitch" was used "to joke about when someone can't pull their weight or are on light duty." Id. Both terms were applied to male officers, but not to a female officer.

6

Aldreich recommended cessation of both. Id.

On or about August 23, 2004, Jones notified Chief Beach of his resignation from the STORM team. Id. at ¶ 22. Jones listed several reasons for his resignation, including the following:

> Lack of work – the detective division has not participated in enough drug suppression work to allow the team to conduct drug raids, which are necessary for us to maintain our skills. I have approached them several times, but since the [Mike] Brashear/[Kevin] Byers transfer, no one seems at all interested in doing steady drug enforcement, which would lead to probable cause to conduct such raids.

Id. at ¶ 23. Jones's memorandum was provided to STORM team personnel and posted throughout the department. Id. at ¶ 24.

On or about August 25, 2003, Montega notified the Town that she would resign effective September 9, 2003 to accept other employment. Id. at ¶17. Montega executed a "Voluntary Quit Form" stating that she voluntarily resigned her position and that her last date of employment would be September 9, 2003.

Montega contends that by the end of Summer 2003, she felt alienated from other officers and intimidated by Jones. Montega believed that she could no longer perform as an officer to the level that was best for the community and therefore sought a full-time position with her part-time employer, Draughon's Junior College. Montega secured a full time position with Draughon's before tendering her resignation from the Town. See Docket Entry No. 33, Montega Affidavit at ¶ 24. Montega was treated by a physician's assistant who prescribed Lexapro, a medication that has a calming effect. (Docket Entry No. 31 Plaintiff's Responses to Defendant Jones's Statement of Undisputed Facts at ¶¶ 21-22). Montega's last Lexapro prescription was October 31, 2003. Id. at ¶ 23. Montega has not seen any doctors or medical professional for any mental condition or illnesses since the spring of 2003. Id. at ¶ 26.

7

Case 3:04-cv-00227 Document 48 Filed 08/16/05 Page 7 of 14 PageID #: 39

In November 2003, Montega filed a charge of discrimination to the Nashville area office of the Equal Employment Opportunity Commission ("EEOC"), alleging sexual harassment by Jones and constructive discharge. Id. at ¶ 9.

At the time of Montega's claims, the Police Department had a harassment policy, Smyrna Police Department Policy Number 2-23. (Docket Entry No. 21 Aldrich Affidavit, ¶ 5, Exhibit C.) Montega concedes that the Town of Smyrna and the Town of Smyrna Police Department policy for reporting and resolving complaints of sexual harassment was effective and accessible. (Docket Entry No. 30 Plaintiff's Responses to the Defendants' Statement of Undisputed Facts at ¶ 29). The only written complaint the Town ever received was from Montega's 2003 complaint alleging sex discrimination. Id. at ¶ 27.

Montega insists that prior to her complaint about Jones, he made earlier complaints of gender discrimination and/or hostile work environment. (Montega Deposition, 37, 49, 50, 51 95, 234-37 and 245; Jones Deposition at 25-26; Dwyer Deposition at 20-21). Montega also made allegations that she was harassed or subjected to a sexually hostile work environment in June and July of 2003, but given her May 23, 3003 complaint, she did not report the allegations. (Docket Entry No. 30 at ¶ 28). Sometime in Spring 2003, Jones told Montega that she needed to act like a "bitch" or an "ice maiden." He also counseled on her on her after-hours behavior at a training school in Meridian, Mississippi. Jones told Montega that she was too flirty when she went out with the other members of the team and that her t-shirts were too tight. (Docket Entry No. 26, Montega Deposition at 263-64; Jones Deposition at 48).

Over the course of her employment with the Town, Montega cites criticism of her clothing while she was off-duty. Montega discussed these incidents with Dwyer and Jones. (Montega

Deposition at 167; Jones Deposition at 25-26). At one point, Montega showed . Dwyer a shirt that she was told was inappropriate to wear to training, but Dwyer deemed it to be acceptable attire. (Montega Deposition at 167). At some point, Dwyer told Montega to dress conservatively and not to wear open toed shoes because some people thought her red toenails were too provocative. Id. at 165. Montega asserts that she endured many rumors while working for the Town. Among them were that Montega was sleeping with Jones, id. at 46, and that Montega had a genital piercing. Id. at 160. According to Montega. Jones paged Montega and asked her if her piercing rusted in the bathtub. Id. at 161:14-18.

Yet, the proof also reflects Montega's concessions that she contributed to these occurrences. Montega admits that she told "dirty jokes" to male officers. Id. at 154-55. Montega discussed her sexual history with the male officers, id. at 158, as well as her breast augmentation. Id. at 159. Montega testified that she probably responded yes to a question about genital piercing. Id. at 160-61. As to her clothing, Dwyer told Montega to be conservative in her dress, id. at 165, but while on a after-work training session, Montega wore a pair of shorts that she described as "more see through than they should have been." Id. at 168. Despite her marital status, Montega brought a male escort to a Town function. Id. at 169. Montega showed officers "glamour" pictures of her. Id. at 179. Montega also participated in the rumor mill about the personal matters of other officers. Id. at 257.

Moreover, Montega, who identifies Jones as the cause of her claims, conceded that at times Jones was "nice", id at 239, and that " a lot of times Jones had issues with male officers." Id. at 55. In her investigation of Montega's written complaint, Helen Aldrich noted that Jones had actually counseled a male officer for not going out with the other members of the team after training. Jones considered the male officer's failure to go out with the guys as not being a team player. (Aldrich

9

Deposition 35:18-25, 36:1-2, Exhibit J, Aldrich Report). On October 6, 2000, the Town's Chief of Police received a memorandum from Ray Jones, another officer complaining that Jones unfairly suspended him from the STORM team. (Docket Entry No. 30, Plaintiff's Responses to the Defendants' Statement of Undisputed Facts at ¶20).

## B. CONCLUSIONS OF LAW

In ruling on a motion for summary judgment, this Court must view the factual contentions in the light most favorable to the party opposing the motion. <u>Duchon v. Cajon Co.</u>, 791 F.2d 43, 46 (6th Cir. 1986). A party may obtain summary judgment if the evidentiary material on file shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of satisfying the court that the standards of Rule 56 have been met. <u>Martin v. Kelly</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).

The Court must determine whether, after all evidence is viewed in a light most favorable to the Montega, her proof will support a judgment for a hostile work environment and constructive discharge under Title VII and THRA as well as on her Tennessee common law claims. The principle issue is whether the alleged sexually harassing conduct was so severe and pervasive to establish a hostile work environment, and whether it was foreseeable that a reasonable person in Montega's position would quit.

An employer may be held vicariously liable for the discriminatory behavior of an supervisor. See <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 787 (1998). Based upon agency principles, the

10

Case 3:04-cv-00227  Document 48  Filed 08/16/05  Page 10 of 14 PageID #: 42

Supreme Court established that an employer is subject to vicarious liability for sexual harassment by a supervisor if the victim suffers a "tangible employment action" as a result of the sexual harassment. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)

Here, Defendant contends that Montega did not suffer any tangible employment action as a result of the alleged harassment necessary to establish vicarious liability because she was never fired, demoted, transferred, reassigned, or given undesirable duties, as a result of the alleged harassment by Jones. Further, Jones did not have final authority to affect Montega's as reflected in the decision of having to order any changes in Montega's shift. The matters of training, shift change and vacation were remedied.

A sexual harassment claim that does not result in a tangible employment action, remains actionable if the conduct is "so severe or pervasive to 'alter the conditions of employment and create an abusive working environment.'" Faragher, 524 U.S. at 786 (1998) (quoting Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986)). Under Faragher, the Court must consider all of the surrounding circumstances, including the frequency of the conduct and whether the conduct is physically intimidating or simply an offensive utterance. Id. at 787-88; see also Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75 (1998); Harris v. Forklift Svs., Inc., 510 U.S. 17, 23 (1993). The Court must also consider whether the plaintiff welcomed the cited conduct. Meritor, 477 U.S. at 67. Daily exposure to offensive behavior may interfere with job performance sufficiently to be actionable. Williams v. General Motors Corp.,187 F.3d 553 (6th Cir. 1999). A single "extremely serious" incident may satisfy the severe and pervasive standard. See, e.g., Oncale, 523 U.S. 75. Tennessee courts apply Title VII principles to THRA claims. Campbell v. Fla. Steel Corp., 919 S.W.2d 26, 31 (Tenn. 1996).

11

As to the Defendant Jones, an individual employee or supervisor cannot be held personally liable under Title VII. <u>Wathen v. Gen. Elec. Co.</u>, 115 F.3d 400, 405 (6th Cir. 1997). While the THRA applies to an "agent of an employer" in its definition to impose individual liability, <u>Carr v. United Parcel Serv.</u>, 955 S.W.2d 832, 835 (Tenn. 1997), <u>overruled on other grounds</u>, <u>Parker v. Warren County Util. Dist.</u>, 2 S.W.3d 170 (1999), with the Court's conclusion on Plaintiff's Title VII claims, Plaintiff's proof as to Jones is insufficient to support a judgment against these Defendants under the THRA.

Based upon the proof, the Court concludes that Plaintiff's proof does not meet the standard to support a judgment on her Title VII and THRA claims. First, Montega has presented proof that at times, her working environment was sexually insensitive and Jones subjected Montega to unfair treatment. Jones, however, treated male officers harshly as well. The Defendant Jones who is the focal point of Plaintiff's claims was criticized by male and female employees. Montega admitted that at times, Jones was "nice" to her. The Defendant investigated Montega's complaint and other incidents. Based upon her grievance and after a prompt inquiry, the Town disciplined Jones about Jones who was reprimanded for his conduct. The report did not find sexual discrimination or sex based treatment of Montega as she did not encounter the cited practices. Second, Montega engaged in conduct or fostered some of these matters about which she complains involvement in rumors, the piercing, discussion of her body parts, her sex history and dating. Plaintiff's conduct must be considered in evaluating her claims. Third, some of the disparate treatment cited did not come to fruition as Plaintiff did attend the training, her vacation proceeded on schedule and the shift change was effected to meet her request. Fourth, many of the acts occurred years before the Plaintiff's decision to leave her employment with the Town and Jones had resigned. Fifth, when the Plaintiff

left her employment she signed a "voluntary" termination form and did not reflect that she quit under protest. For these collective reasons, the Court concludes that the Defendant's motions for summary judgment as to Montegas hostile work environment claim should be granted.

As to Montegas separate constructive discharge claim, Montega must establish: (1) that her employer deliberately created intolerable conditions, as perceived by a reasonable person; and (2) with the intention of forcing the her to quit and that she actually quit. Moore v. Kuka Welding Sys., 171 F.3d 1073, 1080 (6th Cir. 1999). To determine if there is a constructive discharge, both the employer's intent and the employee's objective feeling must be examined. Id. (citing Held v. Gulf Oil Co., 684 F.2d 427, 432 (6th Cir. 1982)). The Sixth Circuit has held that "a claim of constructive discharge is not a tangible employment action for purposes of Faragher and Burlington." Turner v. Dowbrands, Inc., 221 F.3d 1336, 2000 WL 924599, at * 1 (6th Cir. June 26, 2000).

With the collective proof cited above, the Court concludes that the Defendants should be awarded summary judgment on Montega's constructive discharge claims.

As to Plaintiff's remaining common law claims, under Tennessee law, the tort of intentional infliction of emotional distress or outrageous conduct allows a plaintiff to seek recovery "for mental or emotional disturbance alone, unconnected with any independently actionable tort or with any contemporaneous or consequential objectively ascertainable injury.' " Doe 1 v. Roman Catholic Diocese of Nashville, 154 S.W.3d 22, 31 (Tenn. 2005) (quoting Medlin v. Allied Inv. Co., 398 S.W.2d 270, 272 (Tenn. 1966)). In order to assert a valid claim of intentional infliction of emotional distress or outrageous conduct, a plaintiff must establish: (1) that the conduct complained of is intentional or reckless; (2) that "the conduct [is] so outrageous that it is not tolerated by civilized society"; and (3) that the conduct complained of is the proximate cause of a "serious mental

injury." Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997); Doe 1, 154 S.W.3d at 31.

A plaintiff need not present expert testimony of a "serious mental injury"; rather, a plaintiff may present other proof to establish a "serious mental injury", such as the plaintiff's "own testimony . . . as well as the testimony of other lay witnesses acquainted with the [plaintiff]." Miller v. Willbanks, 8 S.W.3d 607, 615 (Tenn. 1999). Moreover, "[p]hyiscal manifestations of emotional distress may . . . serve as proof of serious mental injury. . . . [E]vidence that a plaintiff has suffered from nightmares, insomnia, and depression or has sought psychiatric treatment may support a claim of a serious mental injury." Id. Indeed, "[t]he intensity and duration of the mental distress are also factors that may be considered in determining the severity of the injury." Id.

For the reasons stated on the Plaintiffs' Title VII and THRA claims, the Court concludes that Plaintiffs' proof also would not support a judgment on these Tennessee common law claims.

For the foregoing reasons, the Court concludes that Defendants' motions for summary judgment (Docket Entry Nos. 14 and 23) should be granted.

An appropriate Order is filed herewith.

ENTERED this the _15th_ day of August, 2005.

WILLIAM J. HAYNES, JR.
United States District Judge

14